number 20-2383. We welcome counsel, and although we wish we could see you live, Zoom is the best we can do, but we are happy to see you via Zoom. The rules are pretty much the same. It's 15 minutes per side. We'll ask the appellant, or rather the petitioner, whether the petitioner would like some rebuttal time. Otherwise, we'll just handle it like a regular argument. So appellant's counsel, Mr. Arad, do you want to reserve any time? I'm sorry, we can't hear you. Apologies. Yes, Your Honor. Five minutes, please, with the permission of the court. Okay, that's granted. If I could just ask you, this isn't on your time yet, but are you handling this case pro bono? Yes, Your Honor. Okay, good to know. Thank you. And I want to thank you for doing so. We really put great value on attorneys who volunteer their time, as you and your firm have, and thank you. I hope your client realizes how well he's being represented here by you. So thank you so much. So we'll hear your argument now. Your Honors, and may it please the court, I'm Ben Arad of Wankler, Sifford, and Wohl for petitioner Tunde Ali-Olau. This case is on appeal from a decision of the Board of Immigration Appeals denying a motion to reopen removal proceedings. The most straightforward basis for remand in this case, the BIA all but ignored 12 articles and reports submitted by Mr. Olau, showing a material deterioration of conditions facing Christians in Nigeria. The BIA addressed Mr. Olau's changed conditions evidence in one short paragraph, ending with the cursory statement that the violence cited by Mr. Olau appears to be a continuation of the same violence that prevailed before Mr. Olau's underlying removal hearing. Can I ask you a question, Mr. Arad? Yes, Your Honor. Would any of this make a difference to the persecutor bar? Any of this new evidence? Could the new evidence change that? No, Your Honor. The BIA's failure to meaningfully consider this particular evidence would not necessarily make a difference for the application of the persecutor bar. However, even if the persecutor bar were to remain in place, remand is warranted and so is reopening because Mr. Olau would remain eligible for relief under the Convention Against Torture. In addition, Mr. Olau has been diagnosed with schizophrenia and prescribed antipsychotics since his underlying hearing. If his removal proceedings are reopened, the immigration judge will have the opportunity to hold a competence evaluation. That competence evaluation could lead to any number of safeguards, which may include new testimony on the issue of the persecutor bar. So there is a chance, even if the court were to remand to the BIA based only on this issue, that the persecutor bar would be lifted. Even if the persecutor bar would not be lifted, Mr. Olau would still remain eligible for relief under the Convention Against Torture. Now, the evidence that the BIA... I'm sorry, Your Honor. I couldn't tell if you were going to jump in there. Well, I was going to ask you the... I understand you got the potential for a CAT claim, but speak for a moment to the standard of review we have to operate under here. You've asked for us to send this back for the court to exercise, for the BIA to exercise its sua sponte authority to reopen. Is that right? Well, we're asking for... I'm sorry. I couldn't tell if somebody was going to jump in. That would be a little bit of an echo. I'm sorry. Let me try that again. One of the things you've asked us to do is to have the court send back the case to the BIA for it to exercise its sua sponte authority to reopen, right? Yes, Your Honor. I think I did get your question. Okay. That is one of the three things that we're asking this court to do. On the sua sponte issue, it's Mr. Olau's position that the BIA denied sua sponte relief on the incorrect legal premise that there were no due process violations in his underlying proceeding. While this court rarely... Thanks. No, that's what I want to explore with you. And I read what you have to say on that. Here's my question to you. You frame this as they operated on an incorrect legal premise. Is it fair to look at that not as a framing principle, but simply a disagreement about what constitutes a due process violation? That is, we think it was a due process violation. They think it wasn't a due process violation. It's not that they misunderstood their authority. It's not that they misunderstood the law. It's that they thought the facts didn't rise to the level of a due process violation. Is that a fair way to look at the record? It's a way to look at the record, Your Honor, that would not be consistent with this court's precedent. In Pineda-Gonzalez, this court described a due process challenge as, quote, a legal challenge and expressly distinguished it from a factual issue. A sister circuit, the Tenth Circuit, has ruled that the BIA's rejection of a due process challenge is a legal determination which we reviewed de novo. There is theoretically a way to look at the due process issue as a question of fact, what actually transpired at the hearing. But there's another way to look at it, as those courts suggest we should, which is that the question is whether the facts on the record rise to the level under the law of a due process violation. And that is the question that we ask this court to answer today. We submit that the due process violations that occurred in Mr. Allow's underlying hearing do, in fact, rise to the level of due process violations under the law because the only relevant question is whether Mr. Allow was able to understand and be understood at his underlying proceeding efficient to answer. There's ample evidence. I thought there was something beyond that. I mean, I knew you had a translator issue, right? And I understood that. But I thought your your main argument was he was denied due process because he got pressed to represent himself wrongly. Did I misunderstand you? There is another very important argument that we are making here, Your Honor, and that has to do with Mr. Allow's mental competence. Just weeks before his underlying removal proceeding, the merits hearing, he suffered a psychotic episode while in DHS custody. And we know that because DHS prison staff notes say that he suffered paranoid delusions that he was going to be poisoned by prison staff and he was placed on suicide watch. The Department of Homeland Security had an obligation under the BIA's precedential opinion of to provide that information to the immigration judge so that the immigration judge could see that it was an indicator of incompetence and then hold a competence hearing. But none of that happened in this case, Your Honor. And that is another very important argument in our three pronged argument for why there were due process violations here. Your Honor alluded earlier to the fact that the immigration judge told Mr. Allow that his proceedings would be, quote, easy and, quote, straightforward. And that simply is not the case. Now, certain other circuits, the ninth circuit in particular, require immigration judges to specifically ask petitioners if they understand the consequences of proceeding pro se. That's not a requirement here, but certainly judges. Is there is there a point, though, at which an immigration judge can say, I've given you enough opportunities to get a lawyer? There was a continuance after continuance after continuance on this record. And you can see on the face of the the the record as sort of rising, perhaps level of. Frustration on the part of the immigration judge, I can't keep doing this. And if you if and so we're either going forward today or, you know, is there something wrong with an immigration judge saying I've given you repeated opportunities and your opportunities for this are over? There's nothing wrong with that, Your Honor. But the immigration judge in this case went a step further and actually told Mr. Allow that his proceedings would be straightforward and that they would be easy. And he also told Mr. Allow that he knew questions to ask to get Mr. Allow the relief that he needed if he needed it. Assume assume the judge hadn't done that. OK. Assume we thought with you. Well, that was a mistake. Shouldn't have said that, IJ. But this is for the sake of the sake of discussion. If the judge had said nothing except look, we're moving forward without a lawyer because I've given you repeated opportunities to get your lawyer here. Get a lawyer and you haven't done it. So it's time to proceed. And hadn't said anything about this is easy and implied I'll take care of you. What would your argument be? This would be a very different case, Your Honor. And in fact, that is not the case before us. An immigration judge certainly can at some point say you've had an opportunity to find a lawyer and you haven't. And we need to move forward. But as I said earlier, that is not all that happened in this case. It was critical that the judge told Mr. Allow that his proceedings would be easy and straightforward. How did that how did that prejudice him? Stick with me on this hypothetical. Assume the judge hadn't said anything and they just went ahead. And would not the same things have have flowed from proceeding without a lawyer? Same kind of questions to Mr. Allow. Same kind of answers from Mr. Allow. Not necessarily, Your Honor. When the judge told Mr. Allow that his application would be easy and straightforward. There were still four months left before the underlying merits hearing. Let's say the odds that Mr. Allow would have ended up getting a lawyer without those comments from the immigration judge were 50, 50 or 70, 30 or whatever they might have been on that day. Those comments from the immigration judge may well have put the thumb on the scales and affected the odds that Mr. Allow would, in fact, find counsel in the four months between when those statements were made and when the underlying merits hearing was held. So it's entirely possible that those statements could have made a difference in this case. And when taken together with Mr. Allow's inability to fully understand what was going on as evidenced by the government's own lawyers comments on the record during his removal proceedings. And when coupled with Mr. Allow's mental illness, which, of course, the I.G. didn't know about at the time. These issues are very important. Your Honors, I see that I've reached the end of my time. Counsel, I have a question for you. It seems like your brief focused a lot on the newly available evidence of his mental illnesses, which are unfortunate, but not much. I didn't see on sort of what the evidence shows about change conditions insofar as people with mental illness are treated in in Nigeria. Are you able to point us to some evidence showing a change in the way folks with mental illness are treated? Yes, Your Honor. Mr. Allow submitted two State Department reports with his application to reopen, one from 2010 and one from 2018. The 2018 report at page 391 of the administrative record says that the detainees were subject to torture and some of these abuses resulted in deaths. That statement is absent from the 2010 report and is at least an indication of changed conditions, which the BIA did not consider. There's one more point on this, Your Honor, which is that the government did not raise this issue in its briefing. And more importantly than that, the BIA did not reach its decision based on this issue. And so and in addition, Your Honor, the case law in this circuit that discusses whether an applicant with changed personal circumstances has to also show changed country conditions tends to focus on cases where the applicant has changed his or her circumstances of his or her own volition. That's not the case here where Mr. Allow's mental illness is completely out of his control. I have a question on the persecution bar. And did Mr. Allow destroy property belonging to Muslim people in Nigeria? There seems to be some difference of opinion as to whether or not property was destroyed. What actually happened at this point? Mr. Allow avows that he never hurt any anybody in Nigeria. The record contains testimony saying that he destroyed certain property belonging to Muslims. But that record is precisely what is in question as a result of the due process violations that occurred in this case. OK, Judge Jordan, do you have anything more? And Judge Sirica, anything more? No. OK, thank you. Thank you, counsel. We'll hear from you on rebuttal and we'll hear from the government. Morning, Allison. I go representing the Attorney General Merrick Garland. This is not just a motion to reopen. This was a motion to reopen. That was not only untimely, given that it was filed eight years after the board's original decision in this case, but it was also Mr. Allow's second motion. Therefore, I disagree. Was his first motion uncounseled, Ms. Igoe? It was uncounseled. I'm sorry. Did I say your name correctly? Did I say your name? Yes, thank you. Yes, his first was uncounseled, but there are many, many instances of people proceeding pro se. And that in and of itself does not make that motion ineffective. He raised the issue of persecution as a Christian. And, you know, reading the motion, it's a very typical pro se motion. So that does not allow him to pass the requirements of the statute, which allow you to have one timely motion to reopen. So in this case, this is not a question of him being able to bypass that restriction by claiming a change in personal circumstances, regardless of whether they were of his own making or not. The statute is very clear. When you have an untimely motion, that is your second motion, you must show changed country conditions relevant to the issues that you want to raise. They say we have done that. We showed a very different, we showed a significant increase in the violence against Christians in Nigeria. That is one issue. However, they never even raised the issue of changed country conditions regarding people who have mental illness. It was never raised in the second motion to reopen. It appears nowhere. Now the petitioner tries to overcome that by in a footnote, footnote 15, dropping a reference to a report, a State Department report from 2019 that is not in the record and that did not accompany his motion. That basically says the treatment of mentally, that there were people who were arrested. All that, even if the court were to consider that which it cannot because it wasn't in front of the board, and it's not part of the record, but even if the court were to consider that all it says is that what the current conditions are, it doesn't show a change. Okay. Focus on the thing that they've said, which was before the board, they, I understand their argument to be, we showed a qualitative difference, not just some continuation of the same level of problem, but an actual change in the country conditions in Nigeria, and the board in the Liam case judges in the third circuit tells you that they're not the board isn't allowed to just ignore the evidence put in front of them. And that's effectively what the board did here. So, no, I'm, I'm not disagreeing with the Liam case but I am disagreeing with what the petitioner is arguing in this case, there is massive evidence in this record, going back to 1999 of the violence between Muslim and Christians. What Mr. Allow relied on the rise of Boko Haram, and ISIS of West Africa, but when you look at the IJ decision the IJ actually referred to Boko Haram so Boko Haram was an issue at the original hearing in this case, back in 2000. It was 2010. When you look at the record, there is an October 2000, or not, I'm sorry, there's a 2010 report, which reports on the conditions in 2009 that report at 318 in October 2009 extremist groups like Boko Haram were involved in attacks. There were curfews in Joss, and this is significant because Mr. Allow was from Joss that is where he lived. Yeah, curfews in jobs because of ethnic religion, I don't think they disagree that there were problems before I take their argument to be. There was a, a, a true and a significant uptick in the violence, there was a measurable uptick in the violence like, you know, like 66% or something they did some calculation and gave a number but they said it's not just a continuation. It's a difference which is a true change in country conditions, and the BIA just simply didn't engage with that evidence didn't engage with the evidence. When the court reads this record as a whole, you will see that that it is not true. I'll point the court to a or three at where reporting 12,000 deaths in ethnic political and religious violence since 1999. That proceeds by eight years, even sure Mr allows. Here's, here's what I'm trying to ask him is I go, where did the BIA. Where did the BIA engage with the evidence that Mr rad is saying they didn't. Can you point us to in the record where the BIA said, we've read this we understand what you're saying, here's why you're wrong and why it's not a change in country condition. Well, I would say that the court did because of the of the conclusion it reached, and I would point the court to its decision in Jane which says that the BIA doesn't have to parse every single piece of evidence. I would say the evidence. Hold on. Council Hold on. I don't think it's a matter of listing every piece of evidence. I think our jurisprudence says you've got at least engage with it. I mean there's an argument that's been made that bi pretty much gave it the backhand if you're to use vernacular. Completely aside from the merits don't we have to send this back and have the BIA do its job. No, because, because Mr allow also had to show a prima facie case that he would and remember he is not in this motion to reopen he is not eligible, unless the court and I'm setting aside the suicide argument but he is only eligible for Convention against torture relief, he has to show is more likely than not, he would be tortured by or with the acquiescence of the Nigerian government. He cannot show that first of all, the court underneath showed that rather the IJ found, and this is a decision that is a lot of the case that he was not persecuted in the past. So he has to show counsel, counsel. I'm afraid we're talking past each other. We're reviewing a decision of the BIA right now and we're concerned that the BIA hasn't engaged with the evidence. I understand you're going to the merits it's it's it's you know it's it's the argument you ought to be making but we're asking you about. They've got a responsibility to do something aside from the merits completely have they done so here, have they engaged with the evidence and you know you cited in your I know you're well aware of our lean case which which discusses that should this case be sent back. You could argue that, Your Honor, if there were evidence supporting what the petitioner is arguing. But what I am saying is the evidence in this in this record is so overwhelming of the fact that there is religious violence between Muslims and Christians in the north where where there's where Mr allow lived that dates back to 1999. It would be fruitless to send this back when the evidence itself is overwhelming. I mean, well they got a different view of that right and that's the whole point about requiring the BIA to engage with the evidence I mean, as an advocate, you've read this record and you have a very distinct view which is one that you are articulating with some passion here and those briefing reflects it, but there is a, but there is another side to the story it's not so overwhelming that the pancakes only got one side and as I go that's the whole point of getting the getting the, the BIA to engage with the evidence, because it may very well come out the way you said it, but if they don't do their job, that's a problem but but turn for a second to the due process argument. Why, why should their assertion about. Look what the IJ did here was outlandish just can't be tolerated, and that the mental health issues play into the due process side. Just take, take that on head on why, if you wrong what's the answer. First of all, I'd like to, I'd like to point out that the petitioners council said the IJ didn't know about his health issues and didn't have this information that in and of itself shows that this case was very consistent with the board's decision and mam, because in that case, and in very many Court of Appeals cases, there has to be indicia of incompetency in order to trigger a mental health hearing. And in this case, the record is bear of any indicia. What about the DHS, what about the psychotic episodes when he was under in custody. Well, I know I, I appreciate the petitioners council has, you know, described that in very, you know, compelling terms, but when you read. This was one incident on November 14, which was one, one month before his final hearing up until that point he had had very many. He had been examined on April 15 he had been examined on April 19, he was found his neuro was a found was found to be fine. He was alert, he was responsive he didn't show any indication. All that says on 11 for was that he was complaining about them poisoning him, and that he has some psych issues in ma'am in ma'am. Pardon me, ma'am is a different case but in that ma'am. The board said that even a person was serious mental issues can still, you know, go through a hearing, if he is provided with the, you know, proper due process protections. In this case, when you read this transcript, this man clearly knew what the charges were. He wanted to because he was detained and I and I'd like to point out, he was detained and so his focus was on getting out of detention. He was in for a long time right like three years for a very long time. Yeah. Okay. So in a circumstance like that. Does that, does the IJ not have some heightened obligation maybe to pay attention to whether the person's got some decent representation knows what's going on because they're detained, I should actually ask it this way, forgive me. Do we know from this record whether the IJ provided the information about access to counsel here are services that you might access it would help you have a lawyer with you. Do we know that from this record, yes, the record shows that the IJ gave him the information about about attorneys, and about, and he actually even met with with several attorneys. So, and he consulted with them but they either weren't available or he couldn't afford them and the IJ also gave him information about people who he told Mr allow might represent him for a minimal cost or even for free. He was told that. And, and when you read the record I invite the court to really take a look at what the IJ did in this case the IJ gave this gentleman significant amount of time, helped him to try. That's true. All that is true. Nobody's I don't even hear the other side Mr rad seems to just like embrace that and recognize there was plenty of opportunity given here, but, but speaking of engaging engage with the argument that we're dealing with this the case that's different because here the IJ didn't just say, look, I gave you enough chance the IJ said you don't need a lawyer, sir, it's a very straightforward application and you speak English, it's a very easy application to fill in. You don't need a lawyer there any number of people come into this court and I know the questions to ask in order to make sure you get it if you need it. All those things that seem to say, you don't have to have a lawyer and I'm going to take care of you, does that does that change this from a legal perspective does it put this on a different footing. He said that after Mr allow said that he wanted to represent himself, because he could not get a lawyer to represent him. So I would say it was not significant in Mr allows decision to represent himself. And I'd also when you say he said that after Mr allow said he wanted to represent himself. Didn't Mr allow say I want to represent myself after the judge said, Look, if you don't have a lawyer. I'm deporting you. I mean there was and and Mr allow said, Don't do that. I'll represent myself, isn't that how that conversation went. I think perhaps that your recollection is correct, but that is a that's a statement of what would happen in a hearing, you're either going to have a lawyer and and and defend yourself, or I don't you think there's I mean that's, that's, that's true but doesn't it matter how the IJ says what the IJ says if the IJ says you're, you're representing yourself, or you're getting deported. Like, that's like the ultimate hammer, you know, I don't think that's what he said, Your Honor. He gave. I mean, you know, as you asked earlier I think where is just Jordan asked earlier, at some point, this has to move forward. There were 1234566 hearings that preceded this December hearing at every single one. The, the IJ in this situation, he tried to help Mr allow contact his, his wife. He even gave him the phone number for his wife to call. He gave him information about attorneys, he gave him in, you know, he allowed him time to try to, to contact the friend that he referenced who could help him. Every single time Mr allow came back and said I didn't do it. All that. All that's true, and and here's what I'm trying to focus in on the, the, is the legal position that the government is taking that because enough opportunities and there were multiple opportunities given to get a lawyer because multiple opportunities were given, and the government through the IJ would have been within its rights to say it's time to move forward, that it doesn't make any difference what the IJ said at that point, the IJ said is irrelevant. Because when you read the entire record you cannot take that and the petitioner has been very good about this. And I would say I do resent the in the reply brief, saying that I misrepresented the record I invite the court to look at every single site. And unlike the petitioner in this case I cited to every single statement that I made, and, and I stand by how I represented this record, but the court cannot take one or two references out of a transcript that spanned six different days and was very extensive. Well, wait, hold on, hold on. Wait, because I go, this guy go you'll have a chance to finish. You're saying context matters and you said that in your briefing to what context helps the statement. You don't need a lawyer. This is very easy. Anybody. I'm going to represent myself. That that was a statement that well that's fine then you don't need one I'll help you through it, which is what IJs do. And when you. And I would say that with a due process violation, you have to show prejudice, there is no prejudice in this case, you know the petitioners counsel in this case wants to argue that, oh, he didn't understand English in his original I 589. He said that he was a fluent in English. He never said that he did not understand the English in this case. He, he, you know they say oh he would have had a lawyer well that would have been fine but he probably would have lost because his asylum application was untimely, the petitioners counsel, nowhere in this brief says how they would have cured that issue his. He was late, and it was denied on that basis. He admitted when you read the transcript, and when you look at his I 589, he admitted to destroying property, and that raised the persecutor bar, and the IJ also found that he was not a good lawyer, so that is some sort of magic potion that would have cured all of the oils in this case, but in fact, you know, the evidence in this case when he testified showed that he didn't have. He didn't show evidence he testified in his own behalf, he didn't show evidence of past persecution, so he had to show on its own face, a well founded fear of future persecution, besides the fact that he wasn't eligible because of the one year bar, and he wasn't eligible because of the persecutor bar. So, you know, you'd agree, you'd agree, you'd agree the cat claim would be would be live his asylum, withholding of removal off the table, but I would agree the cat. And I did agree the cat came cat claim would be live. However, a cat claim is a very different issue. I can't claim has to show persecution he doesn't rather torture not persecution. He does not have evidence of prior torture. Okay, so he has to show that it's more likely than not, not just that he would be tortured, but by or with the acquiescence of the government, right. Okay, and that is very important, and the evidence does not show that, in this case, and, and, you know, petitioners council sort of ignores that but in fact there is evidence that the IJ cited that the government in this case was blamed for torturing those people that, you know, to try to prevent them Boko Haram, and the other Islamic militant groups to try to prevent what they were doing in northern Nigeria. Okay, so it's government did not agree and they were not part of this. And I would just, I just like to one mentioned because they talk about prison conditions but prison conditions by itself. This, this court's decision in August, dealt with the prison conditions in Haiti, and it said that they may be harsh and and terrible, but prison conditions by itself, unless you can show that that the particular person was was targeted that general prison conditions that are applied to everyone, all detainees don't rise to the level of cat protection or torture for purposes of cat project. Well, I asked your adversary about whether there's any specific evidence about treatment of folks with mental illness in particular. Are you aware of any. I am not in this record. They do say that that people with mental illness were arrested. But first of all, it doesn't show a change in country conditions, it appears as though that is the general condition there, and it doesn't really there. It doesn't say that they are targeted by the government for torture. And that's what's significant in this case because that is what that is the only protection that Mr allow has setting aside the fact that he is barred from from other relief. And, and, you know, I would return to to August, which said that it's not me or even if they were arrested and imprisoned. If they are subjected to the same conditions that other detainees are it's not because they are because of their mental illness. All right. Thank you, counsel. Thank the court for its time, and I would rest on the booze. Thank you very much. Thank you, Judge Jordan. Anything more. Just Erica. Okay, thank you counsel will hear from petitioners counsel for five minutes. Thank you, Your Honor's judge regards I'd like to pick up on a question that you left off with there, which has to do with the showing that Mr allow might be tortured, based on his mental illness, if you were returned to Nigeria. Mr allow presented evidence in the record that in most African communities, it is believed that mental disorders result from supernatural causes such as witchcraft. Was this presented to the be was this presented to the IJ. This. This was not presented to the IJ because the issue of mental illness was not before the IJ. Mr allow didn't know at the time of his mental illness but it was presented to the BIA. It was presented to the BIA. Correct. Does that, does that, does that matter, like if you if you fail to present something to the IJ and you presented on appeal for the first time. Is that properly. Before the BIA something they can properly take account of. Yes, Your Honor, on a motion to reopen based on changed conditions petitioners submit additional evidence to the BIA. Well, that's true that's if you're trying to prove changed conditions. Sounds like what you're saying, and I think I heard Miss I go referencing this is a change in his condition, not a change in the country, it's not, it's not that these fears about supernatural causes of mental illness sprang into effect after his hearing with the IJ, that was something that goes way back. It's that now he's got a mental illness so he wants to talk about it so if it's just his personal conditions that have changed. Isn't that of no moment when you're talking about overcoming the time and number bar. It is a moment, Your Honor. So, in other cases in this circuit, I'll give you some factual examples petitioners for example who hail from China, and arrived in the United States before they had any children, subsequently had children, and then moved to reopen based in part on their changed personal circumstances for fear of what would happen to them under China's one, one child policy, and in part, based on changed country conditions in China, showing that evidence there, there is evidence that the situation there has gotten worse and that is what Mr Well wait wait wait, there you go you put your finger right on it. What made those cases cognizable were the applicants the petitioners were able to say, Now I have more than one child, and things are worse in China than they were. And now. So, here on this specific issue I'm not talking about other issues I'm talking about the mental illness issue that you're addressing. This is an issue that is. It's purely a change in his circumstance right there's no evidence in the record that mental, mentally ill people are being treated worse now than they were before this isn't like your persecution claim for Christians, this is just, I'm mentally ill now. And that's a problem for me but that's a personal issue not a change country can issue right. Well, Your Honor. There is some evidence. I'm sorry I think I heard an echo. There is some evidence in the record that changed that conditions have gotten worse for the mentally ill and more generally that torture is more prevalent now in Nigeria than it was before. Critically though the BIA did not base its conclusion on this issue the BIA directly reached the question of whether Mr allow would be tortured, based on his mental illness in Nigeria, and decided based on that alone. Moreover, Your Honor, the BIA reached that conclusion, also with a very terse analysis of the record evidence, same as with the country conditions facing Christians in Nigeria issue. And so at the very least, this court should remand to the BIA to read to fully consider that evidence of changed country conditions, and Mr allows personal condition with respect to the mentally ill, just one more point I'd like to make on this Your Honor. There are cases where a petitioner has been found not to have properly moved to reopen based on changed personal circumstances, and those cases tend to be ones where a petitioner has voluntarily changed his or her own circumstances, but that's not the case here where Mr allows mental illness is completely out of his control. I don't think I don't think anybody's contesting that Mr. Understood, Your Honor. I'd like to address a point that the government made about the pre hearing psychotic episode report that was that is an issue in this case, I understood the government to be saying that were a back and forth about what that report actually meant, and whether it actually showed incompetence, the government at before the IJ would have showed that there was evidence of no mental illness, preceding that report, but that is precisely the kind of conversation that was supposed to take place in a competence evaluation, and the I see I'm out of time. Are there any further questions. Well, yeah. Judge Jordan, do you have any. And Judge Erica. Oh, okay, thank you. Well, we thank counsel for their excellent argument, and they're excellent briefing in this case. Again, we thank Mr Rod and his law firm for for handling this. We do appreciate that. We'll take the case under advisement.